FIRST SECURITY SAVINGS,
Appellant,

v.

KANSAS BANKERS SURETY
CO., Appellee,

v.

James L. GILLETTE, et al., Third
Party Defendants.

FIRST SECURITY BANK &
TRUST, Appellant,

v.

KANSAS BANKERS SURETY
CO., Appellee.

Nos. 87–1660, 87–1661 and 87–1769.

United States Court of Appeals,
Eighth Circuit.

Submitted April 15, 1988.

Decided June 16, 1988.

Rehearing and Rehearing En Banc
Denied July 27, 1988.

James B. Cavanagh, Omaha, Neb., for appellant.

Gregory Bien, Topeka, Kan., for appellee.

Before ARNOLD, WOLLMAN and TIMBERS,* Circuit Judges.

TIMBERS, Circuit Judge.

First Security Savings ("FSS") and First Security Bank & Trust ("FSB&T") appeal from summary judgments entered March 3, 1987 and March 6, 1987, respectively, in the District of Nebraska, Warren K. Urbom, *District Judge,* holding that Kansas Bankers Surety Co. ("KBS"), which had issued both banks a bankers blanket bond and an excess employee dishonesty bond, had valid defenses against coverage for losses sustained by the banks as the result of a dishonest employee. The court held that FSB&T was not covered since the bonds were "discovery" bonds and the bank had "discovered" the employee's dishonesty before the bonds went into effect. FSS was not covered, the court concluded, since former employees were not covered; when the bank signed the bond application, the employee involved already had resigned.

We affirm the court's summary judgment in favor of KBS and against FSB&T. Although we disagree with the court's holding that former employees were not covered under the bonds issued to FSS, our

* Of the Second Circuit, by designation.

disagreement does not affect the result. We affirm the summary judgment in favor of KBS and against FSS, based on our conclusion that the defense of discovery is equally available to KBS against FSS as against FSB&T.

## I.

We shall summarize only those facts believed necessary to an understanding of the issues raised on appeal. Of necessity, fully to address the legal issues involved, a somewhat lengthy exposition of the facts seems appropriate.

During the relevant time period, James Gillette and his wife Nancy Gillette owned 100% of the stock in Olympic Investment Company, which in turn owned 90% of the stock in FSS. John Urquhart owned the other 10% of FSS stock. The Gillettes also owned 100% of the stock of FSB&T's holding company, Beatrice State Company. The Gillettes had financed their purchases of stock from Marvin Copple and S.E. Copple (Nancy's grandfather) with loans from First National Bank of Omaha ("FNBO"). James Gillette and John Urquhart held the same offices in both FSS and FSB&T. Gillette was president and chairman of the board, and Urquhart was secretary-treasurer, of both companies. Each also was on the board of directors and both were the primary loan officers of both companies.

Under Nebraska banking law, both FSS and FSB&T were required to carry fidelity bonds on all officers and employees. Neb.Rev.Stat. §§ 8–110, 8–403.05 (1983). To comply with this requirement, since their policies with their prior insurers were about to expire, FSS and FSB&T applied to KBS for bond coverage. On January 28, 1983, Larry Keslar, and FSB&T vice-president, executed on behalf of FSB&T the application for bond coverage from KBS. On April 11, 1983, Urquhart executed on behalf of FSS the application for bond coverage from KBS. Both applications required the applicant to list its present employees and to make a representation that:

"The present officers and employees of the Insured have, to the best of the Insured's knowledge and belief, while in the service of the Insured always performed their respective duties honestly. There has never come to its notice or knowledge any information which in the judgment of the Insured indicates that any of the said officers and employees are dishonest."

KBS issued an excess employee dishonesty bond and a bankers blanket bond to both FSS and FSB&T. The FSB&T bonds became effective on April 20, 1983, providing up to one million dollars coverage. The FSS bonds became effective April 11, 1983, also for up to one million dollars coverage.

The bonds indemnified FSS and FSB&T for "loss resulting directly from one or more dishonest or fraudulent acts of an Employee." They were "discovery bonds"; they only covered loss *discovered* during the period covered by the bond. The bonds defined "discovery" as occurring "when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred, even though the exact amount or details of loss may not then be known."

Between 1980 and 1983, James Gillette handled a number of transactions, now known to be dishonest, whereby a total of more than $1,000,000 was removed from FSS and FSB&T under the guise of "loans" to "straw men", but in actuality they were on behalf of Newton Copple, Nancy's uncle (the "Copple loans"). Copple already had borrowed up to the legal lending limit from both institutions. These transactions illegally enabled him to obtain more money from them. Gillette was the only FSS and FSB&T representative involved in these illegal transactions. The loans were not paid back. The instant dispute stems from the losses from the Copple loans that FSS and FSB&T claim are covered by the KBS bonds.

On January 6, 1984, FSS and FSB&T submitted notices of potential claims to KBS. On March 6, they submitted notices of proof of loss in excess of $2,000,000. KBS denied coverage, cancelled the bonds, and issued temporary coverage for sixty days to the institutions, but only for losses

arising out of actions which actually occurred during the sixty day period.

Subsequently, FSS and FSB&T separately commenced the instant actions in a Nebraska state court on January 15, 1985. The case was removed to the United States District Court for the District of Nebraska upon KBS's motions filed February 19, 1985. The actions were consolidated for trial. After the parties completed lengthy discovery, KBS moved for summary judgment against both FSS and FSB&T. The district court granted both of KBS's motions. In a judgment entered March 3, 1987, the court granted summary judgment to KBS against FSS based on the court's conclusion that Gillette, a former employee not specifically listed in the bond, was not covered by the bond. In a judgment entered March 6, 1987, the court granted summary judgment to KBS against FSB&T, based on the court's finding that FSB&T had "discovered" Gillette's dishonesty before the effective date of the bond.

From these two judgments, the instant appeals were taken.

As disclosed during discovery, the illegality of the Copple loan transactions was uncovered as a result of lengthy investigations by state and federal authorities. A summary of these investigations follows.

### FSB&T

In late 1981 and early 1982, a number of violations other than the Copple loans initially were uncovered by the Nebraska Department of Banking & Finance ("NDB&F") and the Federal Deposit Insurance Corporation ("FDIC"). These violations included insufficiently documented loans and Gillette's sale to FSB&T at above market value of a bond he owned. The board was notified of these problems. An FDIC examiner sent a Report of Apparent Criminal Irregularity to the United States Attorney's Office concerning the bond.

The FDIC again examined FSB&T in November 1982. The examiner found further violations. He sent four more Reports of Apparent Criminal Irregularity to the United States Attorney's Office. These reports criticized irregularities in loan procedures and specifically criticized irregularities in the Copple loan transactions. Among the irregularities cited were: that Copple had enticed others to sign or he had forged signatures on loan documents; that FSB&T had allowed the signing of loan documentation to occur outside of the bank without a loan officer present; and that FSB&T had failed to require complete credit documentation prior to advancing proceeds from loans. The examiner concluded that Gillette either had handled or directed the handling of all of these transactions. The FBI also began to examine both FSB&T and FSS but did not disclose the specifics of its investigation.

On January 20, 1983 the FDIC called a special meeting of the FSB&T board. Directors Gillette, Urquhart and Reed, as well as FSB&T counsel Charles Pallesen and representatives of FDIC and NDB&F attended the meeting. NDB&F circulated a memorandum from an FDIC assistant regional director to the regional director describing the discussion at the meeting:

"The purpose of the meeting was to advise the bank directors and their counsel of ... (b) the intention of the Regional Office to recommend that the Corporation commence action under Section 8(a) of the FDI Act to remove ... Gillette as an officer and director of the bank; ... and (d) the intention of the Regional Office to advise the U.S. Attorney General's office of an apparent violation of the Federal Criminal Statutes (18 U.S.C. 4) by one of the bank officer-directors."

Although the Copple loan transactions were discussed at the meeting to the extent that they exceeded the legal lending limit, the FDIC did not state specifically that the criminal violation related to these transactions. Gillette, however, was named specifically as the violator. Subsequently, Gillette resigned as president of FSB&T and FSS and surrendered his Nebraska State executive officer's license.

In late 1982, FNBO, which had financed the Gillettes' purchase of stock in FSB&T's and FSS's holding companies, became concerned with the Gillettes' line of credit, which was secured by their stock in FSS

and FSB&T as collateral. As of March, 1983, the loans exceeded $2,500,000. FNBO also became concerned about the financial health of FSB&T and FSS, particularly the money involved in the Copple loans. On April 8, 1983, FNBO entered into an agreement with James and Nancy Gillette, personally and as representatives of Olympic Investment Company and Beatrice State Company (the holding companies of FSS and FSB&T respectively). Basically, under the agreement, among other things FNBO would accept the Gillettes' stock in satisfaction of their debts and would take over FSB&T and FSS. NDB&F made certain concessions to enable FNBO to take over the banks. KBS was informed of FNBO's actions before issuing the bonds involved in the instant dispute to FSB&T and FSS.

KBS deposed Urquhart on February 5, 1986. Urquhart testified that he became aware on December 1, 1982, when he was interviewed by the FBI, that the FBI was investigating loans in which FSB&T had participated with FSS. Urquhart further testified that FSB&T at least had an indication at the special board meeting held January 20, 1983 that Gillette had committed dishonest acts. Based on prior information, Urquhart concluded that the criminal violation discussed at the meeting related to the Copple loans, although the FDIC had not specifically said so. Urquhart explained that he signed the representation on FSS's application as to the honesty of the present employees because by April 11, 1983, the date he signed the application, Gillette had resigned and no longer was a present employee. Larry Keslar, an FSB&T vice-president, had signed FSB&T's application, which required an identical representation, on January 28, 1983. Urquhart testified that based on his knowledge after the January 20 meeting he would not have made the requested representation on January 28, 1983.

Other evidence relied on by the district court were letters written by William Morrow, one of the attorneys for FNBO, FSS, and FSB&T. On April 13, 1983, Morrow wrote to the Nebraska Bankers Association, the agent for KBS on the FSB&T bonds, stating:

"Your insured, under the above captioned bond, has recently been advised by regulatory authorities that information regarding possible violations of Title 18 United States Code, sections 4, 656, 1001, 1005, and 1014 by James Gillette has been furnished to the Department of Justice.

*Such information relates to incidents occurring prior to the effective date of our bond. Notice has been given to the prior carrier.* This letter is to keep you advised." (emphasis added).

On the same date, Morrow wrote to the New Hampshire Insurance Co., FSB&T's prior carrier, stating:

"Your insured under the above captioned bond has recently been advised by regulatory authorities that information regarding possible violations of Title 18 United States Code, sections 4 [misprision of a felony], 656 [theft, embezzlement, or misapplication by a bank officer or employee], 1001 [false or fraudulent statement], 1005 [bank officer, director, employee or agent issues bank entries, reports or transactions without authority from directors], and 1014 [making false statement or report or willfully overvaluing security to influence federal intermediate credit bank] by James Gillette has been furnished to the Department of Justice. Such information is related to First Security Bank and Trust Company, an affiliate of your insured.

*If such information is accurate, a loss covered by our bond may result."* (emphasis added).

### FSS

In addition to the above information, on August 16, 1982, NDB&F examiners criticized FSS and discussed with the directors violations specifically involving the Copple loans. Urquhart's testimony disclosed that FSS had made loans to the same "straw men" as FSB&T had. Urquhart testified that it was reasonable to conclude that problems with these loans at FSB&T would indicate that there would be similar

problems at FSS. Corroborating Urquhart's conclusion is a letter sent by attorney Morrow, also on April 13, 1983, to Aetna Casualty & Surety Co. ("Aetna"), the previous bond carrier for FSS, stating:

"Your insured ... has recently been advised by regulatory authorities that information regarding possible violations of Title 18 United States Code, sections 4, 656, 1001, 1005, and 1014 by James Gillette has been furnished to the Department of Justice. Such information is related to First Security Bank and Trust Company, an affiliate of your insured. *It is likely that similar misconduct in connection with First Security Savings Company occurred. If so, a loss covered by our bond will undoubtedly result.*" (emphasis added).

## II.

■ With these facts and prior proceedings in mind, we turn directly to whether the court correctly granted summary judgment in favor of KBS and against FSB&T on the ground of discovery.

We take it to be common ground that granting summary judgment is a decision that federal judges should not render without the utmost care. In this case the court's grant of summary judgment in favor of KBS precludes FSB&T from presenting its case to the jury for determination. As the court correctly stated, the burden on the moving party is a heavy one; summary judgment is proper only if the moving party satisfactorily proves "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c).

Moreover, on review we must view the facts in the light most favorable to the opposing party, here FSB&T, and must give that party the benefit of all reasonable inferences. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Foster v. Johns–Manville Sales Corp.,* 787 F.2d 390, 391–92 (8th Cir.1986). Once a motion for summary judgment is made and supported by proper affidavits or other forms of evidence, however, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *McCormick v. Ross,* 506 F.2d 1205, 1208 (8th Cir.1974).

With these standards in mind, we turn to the record before the district court. Crucial to our analysis, in addition to the facts, is the legal standard for determining when "discovery" has occurred for the purposes of liability under a fidelity bond.

The parties agree that Nebraska law governs. Courts consistently have applied the same legal standard. As we stated:

" 'discovery' of fraud or dishonesty is deemed to occur when the insured actually becomes aware of sufficient facts which would lead a reasonable person to believe that an insured loss has occurred ... [A]bsent specific terms of the bond the insured has no obligation to exercise diligence to search out facts which might lead to discovery.... The well established rule is that the insured under a blanket employee's fidelity bond is not bound to give notice until he has acquired knowledge of some specific fraudulent or dishonest act."

*Perkins v. Clinton State Bank,* 593 F.2d 327, 334 (8th Cir.1979) (citations omitted) (interpreting Arkansas law); *accord, Utica Mutual Ins. Co. v. Fireman's Fund Ins. Co.,* 748 F.2d 118, 123 (2d Cir.1984); *Fidelity & Deposit Co. v. Hudons United Bank,* 653 F.2d 766, 774 (3d Cir.1981); *United States Fidelity & Guar. Co. v. Empire State Bank,* 448 F.2d 360, 365 (8th Cir. 1971); *Hidden Splendor Mining Co. v. General Ins. Co.,* 370 F.2d 515, 517 (10th Cir.1966). We "long and consistently [have] held that conduct may be fraudulent and dishonest within the meaning of a fidelity bond even though it falls short of a criminal offense." *First National Bank of Sikeston v. Transamerica Ins. Co.,* 514 F.2d 981, 987 (8th Cir.1975).

In applying the standards to determine when discovery took place for the purpose of ascertaining FSB&T's coverage under

the bonds, the critical date upon which we focus is April 20, 1983, the beginning effective date of FSB&T's bonds. Based on the evidence that FSB&T discovered Gillette's dishonesty prior to April 20, 1983, we hold that the court properly granted summary judgment in favor of KBS, giving FSB&T the benefit of all reasonable inferences. The evidence leading inescapably to this conclusion includes Urquhart's testimony, the NDB&F report of the January 20, 1983 board meeting, and the April 13, 1983 letters from FSB&T to its prior surety companies and to KBS. Urquhart, an officer and director of FSB&T testified as to his awareness of Gillette's dishonesty long before coverage began under the bonds. The discussion at the board meeting called by FDIC clearly accords with Urquhart's testimony. Finally, we view the content of the letters to the surety companies referred to above, essentially ignored in FSB&T's argument before us, to be particularly compelling evidence. FSB&T notified its prior insurer of potential losses covered by the bonds and notified KBS at the same time that its coverage was not implicated, all *before* the effective date of the KBS bond. Although FSB&T correctly points out that mere suspicions do not constitute "discovery", an insured cannot disregard known facts. *Utica Mut. Ins., supra,* 748 F.2d at 123; *Empire, supra,* 448 F.2d at 366. FSB&T's argument that it believed Gillette was honest and merely was concerned with the collectibility of the loans and not their fraudulence or legality is belied by the record.

Equally unavailing is FSB&T's assertion that it was aware only of a potential misprision of a felony by Gillette. The letters sent by Morrow discuss a number of possible criminal violations that certainly include dishonesty by Gillette. The statement in FSB&T's brief that it became aware of Gillette's dishonesty "not until well after the public disclosures from the news media of the FBI investigation" not only is incredible but definitively is rebutted by the evidence. Finally, FSB&T

asserts that application of a reasonableness standard is peculiarly the province of the jury. Almost all of the cases cited above concededly involved appellate review after a jury trial—a fact to which the court gave due consideration. *But see Empire, supra* (involving review of trial court's findings). In the instant case there was compelling evidence that proved that discovery took place prior to the effective date of the bond.[1]

By our decision today, we do not mean to suggest that summary judgment would be appropriate in most cases involving application of a reasonableness standard. Here, however, in essence there was an admission by FSB&T that conclusively resolved the alleged disputed issue—whether Gillette's dishonesty was discovered before coverage under the KBS bond was implicated. Recognizing that normally issues of fact are the province of the jury, nevertheless if we were to accept the proposition that the mere assertion of an issue which generally is the province of the jury should foreclose courts from granting summary judgment, Rule 56 would be rendered a nullity. *See* 10 Wright, Miller & Kane, Federal Practice and Procedure (1983) § 2712, at 582. That we decline to do.

We affirm the summary judgment in favor of KBS and against FSB&T on the ground of discovery.

### III.

■ We turn next to whether the court correctly granted summary judgment in favor of KBS and against FSS.

It is true that the FSS bond application required the insured to list only its *present* employees. We do not agree, however, with the court's conclusion that Gillette, a former employee, was not covered by the bond.

Our prior decision in *United States Fidelity & Guar. Co. v. Empire State Bank,* 448 F.2d 360 (8th Cir.1971), is in point on this issue. In *Empire,* a bank sought in-

---

**1.** At oral argument, appellants' counsel informed us that their suit against their prior insurers, claiming coverage for the same actions involved in the instant case, is pending on appeal.

demnity from its insurer under a bankers blanket bond protecting against loss resulting from the dishonesty of a former executive vice-president allegedly discovered during the policy period. Although the primary question addressed was when the bank "discovered" the employee's dishonesty for purposes of coverage, we also addressed the insurer's defense that the bank had failed to disclose suspicions about the former employee in its application for bond coverage. *Id.* at 366. The bond application involved in *Empire*, like the one in the instant case, required only a certification that *present* employees, to the knowledge of the insured, had performed honestly. Although the bank had suspicions about the conduct of the executive vice-president, it did not inform the insurer because the executive vice-president no longer was employed by the bank. The coverage of the *Empire* bond also was similar to that involved in the instant case. It protected against loss resulting from the dishonesty of any employee "sustained ... at any time" and discovered during the policy period. Since the bond application required only a certification of the honesty of *present* employees, and there was "no provision of the policy, nor of the application, requiring the Bank to give credence to rumors concerning former employees by reporting them for possible investigation", we concluded that there was no merit to the defense that the insurer should not be held liable for the loss because the bank had failed to disclose in its application for bond coverage suspicions about the employee in question. *Id.*

Since neither the bond application nor the policies in the instant case required a representation as to the honesty of former employees, and in the light of *Empire*, we disagree with the court's conclusion that a former employee whose dishonesty was discovered during the policy period and which led to loss by the bank was not covered. The cases relied on by the court are not directly in point. They involved whether a particular individual fell within the definition of "employee" under a bond. *E.g., Third Federal Savings & Loan Assoc. v. Fireman's Fund Ins. Co.*, 548 F.2d 166

(6th Cir.1977) (real estate appraiser hired for a fee not a covered "employee" under the bond); *Pioneer Nat'l Title Ins. Co. v. American Cas. Co.*, 459 F.2d 963 (5th Cir. 1972) (bank attorney's breach of fiduciary duty covered by the bond which expressly included attorneys in definition of "employees"). Finally, coverage under the instant bonds was triggered by discovery of an employee's dishonest acts. If KBS had intended that only present employees should be covered, it easily could have had that limitation written into the policy.

That does not end our inquiry. We must determine whether the judgment of the district court should be affirmed on the alternative ground of the discovery by FSS of Gillette's dishonesty before coverage under the bonds began. Since coverage under the bonds began April 11, 1983, that date is the focus of our analysis.

At the outset we must make clear that the court did not apply the discovery defense against FSS. Rather, it relied solely on the ground that Gillette as a former employee was not covered by the FSS bonds. The court did not hold that the discovery defense was inapplicable against FSS; it just did not address that question after making its determination on coverage. The court ruled on KBS's motion for summary judgment against FSS before it granted summary judgment against FSB&T. Presumably, the FSB&T application was signed before Gillette resigned. Accordingly, coverage for FSB&T could not be denied under the FSB&T bonds applying this same analysis. This still does not explain, however, why the court did not mention applicability of the discovery defense against FSS. Any attempt on our part to divine the court's state of mind would force us to enter the realm of speculation—something we are not willing to do. Since the facts relating to discovery are clearly apparent on the face of the record, we may use them as an alternate ground for affirming the judgment.

Based on the evidence summarized above, we hold that KBS was within its rights in denying coverage on the ground of its alternative defense of discovery by

FSS. The same evidence discussed above applies with equal force with respect to FSS. Although the effective date of the FSS bonds (April 11) was nine days earlier than the effective date of the FSB&T bonds (April 20), the evidence conclusively shows that FSS discovered Gillette's dishonesty before coverage under its bonds began. Urquhart's testimony establishes that FSS discovered Gillette's dishonesty before the effective date of the bonds. Urquhart was secretary-treasurer, a director and primary loan officer of FSS. Many of those present at the January 20, 1983 special board meeting of FSB&T also were involved in managing FSS, its "sister" bank. The information given at the meeting may be imputed to FSS. Conclusive corroboration of this knowledge is the contents of the letter written by Morrow to Aetna, FSS's prior insurer, stating that FSS had been advised by regulatory authorities that Gillette possibly had committed criminal violations. The letter continued that, although this information related to FSB&T, "[i]t is likely that similar misconduct in connection with [FSS] occurred." The letter concluded, "If so, a loss covered by our bond will undoubtedly result." Although the letter was sent April 13, two days after the effective date of the FSS bonds, it is the *content* of the letters, showing knowledge of dishonesty before April 11 as a result of regulatory authority investigations, that is of critical importance.

We affirm the summary judgment in favor of KBS and against FSS on the ground of discovery.

### IV.

To summarize:

The summary judgments in favor of KBS and against FSB&T and FSS are affirmed.

The court properly found that FSB&T had discovered, for purposes of coverage under the bonds, Gillette's dishonesty.

Although the court incorrectly held that Gillette, a former employee, was not covered under the FSS bonds, we hold that FSS had discovered Gillette's dishonesty before the bonds went into effect.

AFFIRMED.