**RESOLUTION TRUST CORPORATION, a corporation organized under the law of the United States of America, Plaintiff,**

v.

**AETNA CASUALTY AND SURETY COMPANY, a corporation, Defendant.**

**Civ. No. 90–1665 PHX RCB.**

United States District Court, D. Arizona.

Sept. 14, 1994.

---

Teresa D. Farrison, Myers & Barnes, P.C., Phoenix, AZ.

Timothy H. Barnes, William G. Ridenour, Ridenour Swenson, Phoenix, AZ.

Curtis A. Jennings, Carolyn M. Kaluzniacki, Jennings & Haug, Phoenix, AZ.

## ORDER

BROOMFIELD, Chief Judge.

Defendant Aetna Casualty and Surety Company has filed a motion for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure. Plaintiff Resolution Trust Corporation (the "RTC") opposes the motion. The court heard oral argument on the matter on September 12, 1994, and now rules.

## I. *INTRODUCTION*

This is the second time that Aetna has moved for summary judgment in this case. In a previous order, the court granted Aetna's first motion with regard to a number of issues, but denied it with regard to others. In its second motion for summary judgment, Aetna urges the court to revisit one of the issues that the court concluded was genuinely disputed. According to Aetna, key witnesses' recent deposition testimony has eliminated any question that judgment is appropriate.

The RTC responds that Aetna's motion must be denied for the same reasons stated by the court in its prior order. The RTC also makes lengthy arguments directed at issues previously resolved by the court.

## II. *BACKGROUND*

The RTC has brought this action in an attempt to recover policy benefits on a fidelity bond issued by Aetna on October 1, 1986. The RTC brings the action on behalf of Community Savings and Loan Association and Community Savings' subsidiary, Community American Mortgage Corporation ("CAMCO").

Aetna insured Community Savings and CAMCO through the fidelity bond for any damages that Community Savings might incur as a result of dishonest and fraudulent acts by its employees discovered between

October 1, 1986, and October 1, 1987. Community Savings allegedly discovered during this time that a former president of the company, James Beck, had acted dishonestly and fraudulently to the detriment of Community Savings and CAMCO.

■ Aetna has refused to satisfy the RTC's claim on the ground that officers of Community Savings and CAMCO knew that Beck had engaged in dishonest and fraudulent conduct before the bond went into effect. Aetna relies on a termination provision within the bond, which states:

[the] bond shall be deemed terminated or cancelled as to any employee ... (a) as soon as any insured or any director or officer not in collusion with such person, shall learn of any dishonest or fraudulent act committed by such person at any time against the insured or any person or entity.

Under the termination provision, the policy never goes into effect with respect to an employee if, before the effective date of the policy, directors or officers of the policyholder were aware of the employee's dishonest or fraudulent act and failed to report it. *See First Sec. Savings v. Kansas Bankers Surety Co.,* 849 F.2d 345 (8th Cir.1988); *C. Douglas Wilson & Co. v. Insurance Co. of N. Am.,* 590 F.2d 1275, 1289 (4th Cir.), *cert. denied,* 444 U.S. 831, 100 S.Ct. 59, 62 L.Ed.2d 39 (1979).

In its prior motion, Aetna argued that Community officials were aware of three different dishonest or fraudulent acts by Beck prior to October 1, 1986, yet did not report those acts. In its current motion, Aetna relies solely on one instance of Beck's conduct, his approval of a loan to Robert F. Gillespie, an official of a Community subsidiary, in April 1986. The loan was illegal because it was secured only by Community stock. Aetna's position is that Community officials knew the loan was illegal and informed Beck of this, but that Beck nevertheless went ahead and ordered that the loan be funded.

In its prior order the court addressed and ruled on three issues that are relevant to the present motion. Initially, the court concluded that Beck's conduct with respect to the Gillespie loan was dishonest or fraudulent as a matter of law. The court found that Beck's criminal conviction for this loan transaction was dispositive proof of his dishonesty or fraudulence. Thus, the court granted Aetna's motion for summary judgment with regard to this issue.

Second, although the court concluded that Beck's criminal conviction for fraud established that he had committed a dishonest or fraudulent act in authorizing the loan, the court held that a question of fact existed as to whether one or more Community officials were aware of the dishonest or fraudulent nature of Beck's conduct prior to October 1, 1986. The court found the issue to be very close, but concluded that Aetna had to show more than that Community officials were concerned about the legality of the loan. The court thus denied Aetna's motion for summary judgment on this issue, but specifically stated that Aetna could reurge its motion after further discovery.

Third, the court concluded as a matter of law that Community officials who may have known of Beck's dishonest or fraudulent conduct were not acting collusively with him. The court made this finding because the RTC had produced no evidence other than that the officials had failed to report Beck's alleged dishonesty to Community's board of directors or banking authorities. The court thus granted summary judgment to Aetna on this issue as well.

The parties then took the depositions of three former Community officials: Johnston, Lempke, and Thompson. As is discussed in more detail below, each of these officials testified that the loan to Gillespie was illegal, that Beck was informed that the loan was illegal, and that Beck nevertheless ordered the loan to be funded and subsequently documented.

Aetna then filed the motion for summary judgment currently before the court. Aetna argues that the officials' testimony that they knew the loan was illegal, and that they told this to Beck, requires judgment as a matter of law that the officials knew that Beck had acted dishonestly or fraudulently. Aetna also relies on Lempke and Johnston's testi-

mony that, prior to October 1, 1986, they had come to doubt Beck's assurances that the illegal loan would be remedied.

In its response, the RTC argues that Aetna had not established that Community officials considered Beck's conduct to be dishonest or fraudulent merely by presenting evidence that the officials believed that the loan was illegal. The RTC cites cases in which courts held that mere knowledge of lending irregularities was not necessarily knowledge that an employee had acted dishonestly or fraudulently.

In addition, the RTC urged the court to revisit the two issues decided in Aetna's favor with regard to the loan; namely, that Beck's authorization of the loan constituted a dishonest or fraudulent act and that the Community officials had not acted in collusion with Beck. The RTC contends that the record now before the court undermines the court prior rulings on these issues.

## III. ANALYSIS

The court has reviewed all three issues that must be decided in Aetna's favor before it can prevail on its summary judgment motion. After reviewing the parties papers the court has concluded as a matter of law that: (1) Beck committed a dishonest act in authorizing the Gillespie loan; (2) Community officials recognized Beck's act to be dishonest; and (3) although Community officials knew of the dishonesty of Beck's act they were not acting collusively with him. Summary judgment in Aetna's favor, therefore, is appropriate.

### A. Whether Beck's Conduct With Respect to the Gillespie Loan was Dishonest or Fraudulent

#### 1. The Preclusive Effect of Beck's Conviction

■ Beck has been criminally prosecuted and convicted for his conduct in connection with the Gillespie loan under 18 U.S.C. § 657, which makes it a federal crime for an employee of a federally insured lending institution to embezzle, abstract, purloin, or willfully misapply funds of that institution.

In response to Aetna's first motion for summary judgment, the RTC used Beck's testimony at his criminal trial in an attempt to establish that Beck did not intend to act dishonestly or fraudulently when he approved the Gillespie loan. The court rejected the RTC's reliance on Beck's testimony, reasoning that the jury verdict against him is conclusive evidence that he acted dishonestly in authorizing the loan. In its response to Aetna's current motion, the RTC argues that the court erred in holding that the verdict against Beck has a collateral estoppel effect against the RTC given that the RTC was not a party to the criminal proceedings against Beck.

After further review, the court concludes that the RTC is correct on this point. Since RTC was not a party or privy to the earlier criminal proceeding, the court should not have estopped it from arguing that Beck did not intend to act dishonestly when he approved the Gillespie loan. In *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n. 7, 99 S.Ct. 645, 649 n. 7, 58 L.Ed.2d 552 (1979), the Supreme Court stated that "[i]t is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard." The *Parklane Hosiery* Court cited to the Court's previous decision in *Blonder–Tongue Laboratories v. University of Illinois Foundation*, 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971), in which the Court stated:

> Some litigants—those who never appeared in a prior action—may not be collaterally estopped without litigating the issue. They have never had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position.

In this case neither the RTC nor Community had the opportunity to participate during Beck's criminal trial. They thus have never litigated whether Beck acted dishonestly or fraudulently. As such, they are not bound by the jury verdict against Beck.

### 2. Beck's Conduct With Respect to the Gillespie Loan

■ Although RTC is not bound by the jury verdict against Beck, the conviction can still be viewed as evidence of Beck's dishonesty. In returning a guilty verdict the jury found beyond a reasonable doubt that Beck specifically intended to defraud a federally insured lending institution. The court views this as very strong evidence that Beck did in fact act dishonestly in approving the Gillespie loan.

Other evidence in the record supports the court's conclusion that as a matter of law Beck's conduct was dishonest or fraudulent. Beck admits that he was told that the Gillespie loan was illegal before he processed the loan. The three deposed Community officials have all stated that they informed Beck of the illegality of his conduct. RTC's own brief suggests that Beck, as an officer of Community, acted dishonestly by acting illegally:

. . . . .

Corporate officers have a duty of *honesty* and loyalty to the corporation. Obviously, corporate officers' duties include refraining from participation in violations of the law.

(Emphasis added) RTC's Resp. at 15.

RTC attempts to minimize Beck's conduct by suggesting that he intended to later make the initially illegal loan legal by either collateralizing it with something other than Community Shares stock or having the loan financed by another lending institution. The court is not persuaded that Beck's alleged intent to later rectify his initial illegal conduct mitigates his dishonesty. Once Beck proceeded to engage in a knowingly illegal act he could not "unring the bell" by his later conduct.

The RTC then suggests that Beck may not have even known of the illegality of his conduct because of the role of the Milwaukee Company in the Gillespie loan transaction. RTC points out that the Milwaukee Company was the brokerage firm that initially instructed Community officers that it would be illegal for Community Savings to make a loan to an officer of a Community entity for 100% of the purchase price of Community Shares

stock if the loan was secured only by the stock. RTC then notes that it was this very same brokerage firm that demanded payment for Gillespie's purchase of stock. RTC concludes that Beck may have been misled into thinking the transaction was legal because Milwaukee Company, the company that was so well versed in the illegality of such loans, processed the Gillespie loan.

The court rejects this argument. To survive summary judgment, an argument must be more than a "metaphysical" possibility. While it is possible that Beck's conduct was influenced by the Milwaukee company's dual role, there is simply nothing in the record to suggest that it actually was. Despite the fact that Beck has undergone a criminal trial and three major officers have been deposed in the present case, RTC presents nothing suggesting that Beck acted in reliance on Milwaukee Company's brokering of the Gillespie loan.

In sum, the court agrees with RTC that it should not have been collaterally estopped on the issue of whether Beck acted dishonestly with respect to the Gillespie loan, but concludes that, in any event, Beck acted dishonestly as a matter of law. Thus, the court grants Aetna's motion for summary judgment on this issue.

### B. Whether Community Officials Knew of a Dishonest or Fraudulent Act By Beck Prior to October 1, 1986

■ In its prior order the court decided that the question of whether Community officials knew of Beck's dishonest or fraudulent act could not be resolved on a summary judgment motion with the facts before it. After reviewing the now expanded record, the court concludes that summary judgment for Aetna is now appropriate.

It is undisputed that Community officials knew prior to October 1, 1986 that Beck had authorized an illegal loan. Beck did not dispute this fact in his testimony cited to the court, the RTC concedes this fact in its papers, and officials Johnston, Lempke, and Thompson all testified at their depositions that the loan was illegal when made and that it remained that way. In light of this clear

fact, the RTC argues that although the officials knew Beck's act was illegal they did not necessarily view the conduct as dishonest or fraudulent.

The RTC is correct that an illegal act is not *per se* a dishonest or fraudulent act. But the RTC is wrong in arguing that Community officials were not aware of a dishonest or fraudulent act by Beck prior to October 1, 1986. A review of the evidence demonstrates beyond genuine dispute that Community officials viewed Beck's misconduct as dishonest.

Gillespie was an officer of one of Community's subsidiaries. The loan was designed to permit him to purchase stock in Community. Why Beck ordered the stock for Gillespie is unclear, but it is reasonably clear that the motivation behind ordering the stock on April 3, 1986 was to permit Gillespie to take advantage of a stock split with a record date of April 4, 1986.

Gillespie not only did not order the stock, he did not pay for it either. At Beck's insistence, Mike Lempke, Community's CFO, placed the stock order with The Milwaukee Company. On April 10, 1986, the stock had not been paid for, and the broker called Lempke looking for payment. When the call came in, Beck, Lempke, and other Community officials and directors were in a meeting. Lempke told Beck that the broker was on the phone demanding payment and Beck told him to wire the money. According to Beck and William Johnston, Vice–President of Lending, Lempke told Beck that the loan could not be funded because one hundred percent stock loans to officers were illegal. Johnston stated at his deposition that he also informed Beck at the meeting that the loan could not be made, although Beck testified at his trial that only Lempke said anything about the transaction to him. In any event, Beck acknowledged at his trial that he had been told that the loan could not be made, yet he told Lempke to wire funds to the broker anyway.

Beck's contention has always been that he thought Gillespie would put up additional security for the loan and that half of the loan would be refinanced by a different lending institution. Gillespie, however, informed Johnston on April 10, 1986, that he had no intention of purchasing the stock unless the financing was secured entirely by the stock. Lempke, Johnston, and Beck had a discussion within days after the meeting about the loan at which time the illegality of the loan was discussed.

Despite Beck's clear notice that the loan was illegal, loan documents finally executed by Gillespie in June 1986 reflected that the loan was to be collateralized one hundred percent by the stock. By the end of the summer, Lempke and Johnston had become very frustrated at Beck's conduct in authorizing the illegal loan. Each testified that, prior to October 1, 1986, they did not feel they could believe what Beck told them regarding the loan. In particular, Johnston testified that by August and September he and Lempke were of the same view that Beck had *never been telling the truth* as to what was going to happen with the loan—i.e., that additional collateral would be secured or the loan refinanced at another institution.

To reiterate, the termination provision applies when one or more noncolluding officials "learn of any dishonest or fraudulent act committed by" an employee. Lempke and Johnston's testimony establishes that they knew that Beck had knowingly authorized an illegal loan *and,* in their view, had not told the truth to them about how the loan would be handled. This is enough to implicate the termination provision.

The cases RTC cites in its support are not inconsistent with the court's conclusion. Initially, RTC cites *FDIC v. Lott,* 460 F.2d 82 (5th Cir.1972). In *Lott,* a bank president was making excessive loans as part of a scheme to defraud the bank. Officers of the bank were alerted to these improper loans after reading various bank examiner reports. Upon questioning the president, the officers were assured that he was remedying the problem. Subsequent reports confirmed the president's promises. The president, however, was concealing detrimental information that would have revealed the severity of the problem. *Id.* at 85–87.

On appeal the appellate court examined whether the directors and officers in *Lott* knew that seeming irregularities in lending

were the result of dishonest or fraudulent conduct. Because the directors and officers had been provided only with information tending to show that the irregularities were being corrected, the court concluded that they lacked knowledge that the irregularities in fact resulted from criminal, dishonest, and fraudulent acts. In the instant case, however, the officers knew of all of the material aspects of Beck's illegal loan transaction. Further, they concluded after seeing Beck's handling of the matter that he had not told them the truth about the loan from the beginning and that he could not be trusted.

The second case cited by the RTC is *Ohio v. Evans*, No. C–10443, 1993 WL 311681 (Ohio Ct.App. Aug. 18, 1993). In *Evans*, the defendant in a criminal trial argued that the trial court erred in permitting the state to submit evidence of his prior securities violation. Pursuant to Ohio's counterpart to Federal Rule of Evidence 609(a)(2), the court agreed, stating that "[s]elling nonexempt unregistered securities is prohibited and illegal, but it is not necessarily a fraudulent act." *Id.* at *2.

*Evans* merely stands for the proposition that illegal conduct is not necessarily dishonest or fraudulent. The court has already acknowledged this. This does not mean, however, that dishonest conduct cannot be inferred from conduct shown to be illegal. In *Evans* no evidence existed for the court to draw this inference, whereas in the present case the record makes clear that Beck's illegal conduct had caused Community officials to doubt his veracity. *Evans*, which involved an evidentiary ruling in any event, is not inconsistent with the court's decision.

The third case cited by the RTC, *FDIC v. National Surety Corp.*, 281 N.W.2d 816 (Iowa 1979), actually supports Aetna's position. In that case, a bank president had made loans in excess of lending limits. *Id.* at 819. After being criticized by examiners for making such loans, he apparently stopped making them, and examiners commended the bank on its improvement in eliminating such loans. *Id.* However, an audit conducted after the bank closed revealed that the president had continued making these improper loans and that he had juggled the bank's books to conceal his misconduct. *Id.* The FDIC, as receiver, then sued to recover under a fidelity bond issued by the defendant and won a verdict in the trial court.

On appeal, the insurer first argued that the president's conduct was not dishonest or fraudulent and that, therefore, no coverage existed. The court rejected the insurer's argument, giving the terms "dishonest" and "fraudulent" broad interpretations:

.    .    .    .    .

[t]he terms "dishonest" and "fraudulent" as used in fidelity bonds have a broad meaning. They include acts which show a "want of integrity" or "breach of trust." They also include acts in disregard of an employer's interest, which are likely to subject the employer to loss. The fact that one knowingly makes unauthorized loans in excess of authority has been called "such a breach of trust as will constitute fraud or dishonesty within the meaning of the law."

*Id.* (citations and sources omitted). This language is consistent with this court's ruling that Beck's knowing violation of the law in authorizing the Gillespie loan constituted dishonest conduct.

The court in *National Surety* also considered the insurer's argument that no liability existed under the bond because of the bank's failure to give notice of the fraudulent conduct. *Id.* The court rejected the argument, noting that although irregularities had been reported to the board of directors, the board had reason to believe that the improper lending practices had been discontinued. *Id.* Relying on *Lott*, the court stated that more was required to nullify liability under the bond. *Id.* at 820. The present case differs from *National Surety* in that in this case Beck knowingly committed illegal conduct, which was never rectified, and which actually led Community officials to believe that Beck had misled them. Thus, like *Evans* and *Lott*, *National Surety* is not contrary to the court's decision.

After reviewing these cases the court concludes that, as a matter of law, Community officials knew of a dishonest or fraudulent act by Beck prior to October 1, 1986. Although

the RTC argues vigorously that the issue should be submitted to a jury, the record reveals facts which establish that officials were aware of a dishonest or fraudulent act by Beck. The case law cited by the RTC does not mandate a jury issue.

### C. *Collusion*

 In its prior order, the court thoroughly discussed the collusion issue and granted summary judgment in Aetna's favor. The RTC asks the court now to revisit its prior ruling. The court views this as essentially equivalent to a motion for reconsideration. For reasons of judicial economy and finality, such motions are disfavored and are rarely granted. *See Settino v. City of Chicago*, 642 F.Supp. 755, 760 (N.D.Ill.1986). Only in very rare circumstances will the court reconsider a decided issue based on a party's arguments that should have been made at an earlier time.

Although the RTC relies somewhat on the officials' recent deposition testimony, RTC's arguments remain the same. RTC puts forth the legal argument, for example, that Community officials violated their duties to the corporation by not reporting the Gillespie loan to the board of directors. RTC previously made this argument and the court rejected it. Although the RTC now cites more authority in support of the officials' duty to go to the board, the new authorities cited by the RTC do not affect the court's conclusion that the officials did not act in collusion with Beck.

The RTC cites to deposition testimony from the officers which shows their participation in the funding and documentation of the loan. The RTC argues that this evidence creates a triable issue on the issue of collusion. As was discussed at length in the prior order, the mere fact that the officials followed Beck's orders in funding and documenting the loan is not sufficient to constitute collusion.

IT IS ORDERED granting Aetna's motion for summary judgment (Doc. 66). The clerk is directed to enter judgment for defendant Aetna.

DATED this 13th day of September, 1994.